DAVID L. ANDERSON (CABN 149604)
United States Attorney

WILLIAM FRENTZEN (LABN 24421)
Assistant United States Attorney

DANIEL KAHN (NYBN 4196143)
Acting Chief, Fraud Section

JACOB FOSTER (CABN 250785)
JUSTIN WEITZ (NYBN 5027966)
Assistant Chiefs, Fraud Section

Attorneys for the United States of America

FILED
NOV 20 2020
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

MADAN MOHAN,

Defendant.

CASE NO. CR 20 00439 BLF VKD

VIOLATION[S]:

18 U.S.C. § 1349 (conspiracy to commit health care fraud – 1 count)
Notice of forfeiture

SAN JOSE VENUE

INFORMATION

The United States Attorney charges:

**COUNT ONE**

**(Conspiracy to Commit Health Care Fraud)**

At all times material to this Information:

INFORMATION

1

## The Medicare Program

1. Medicare was a federally-funded health care program that provided benefits to persons who are at least 65 years old or disabled. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries." Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS").

2. Medicare was a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f) and a "health care benefit program" as defined in Title 18, United States Code, Section 24(b).

3. Medicare was divided into multiple parts with separate coverages. Medicare Part B was a medical insurance program that covered non-institutional care that included, among other things, medical testing by clinical laboratories, where those services were reasonable and necessary to diagnose or treat medical conditions and that met accepted standards of medical practice.

4. Diagnostic testing laboratories, physicians, clinics, and other healthcare providers, all of which provided services to Medicare beneficiaries, were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

5. To participate in Medicare, providers were required to submit an application in which the providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, were required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors. This included a certification that the provider would comply with the Federal Anti-Kickback Statute, which prohibited the knowing and willful payment of

INFORMATION
2

"renumeration" to induce or reward patient referrals or the generation of business involving any item or service payable by federal health care programs. Health care providers were given and provided with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

6. If Medicare approved a provider's application, Medicare assigned the provider a Medicare Provider Identification Number ("PIN" or "provider number"). A health care provider who was assigned a Medicare PIN and provided services to beneficiaries was able to submit claims for reimbursement to the Medicare contractor/carrier that included the PIN assigned to that medical provider. Payments under the Medicare program were often made directly to a provider of the goods or services, rather than to a Medicare beneficiary. This payment occurred when the provider submitted the claim to Medicare for payment, either directly or through a billing company.

7. Medicare regulations required health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician. Medicare required complete and accurate patient medical records so that Medicare would be able to verify that the services were provided as described on the claim form. These records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the health care provider.

8. Medicare paid for claims only if the items or services were medically reasonable, medically necessary for the treatment or diagnosis of the patient's illness or injury, documented, and actually provided as represented to Medicare. Medicare would not pay for items or services that were procured through kickbacks and bribes.

INFORMATION
3

### Rules and Regulations Regarding Allergy Testing

9. CMS regulated all laboratory testing (except research) performed on humans in the U.S. through the Clinical Laboratory Improvement Amendments ("CLIA"). All clinical laboratories were required to be properly certified by CLIA and state regulatory agencies.

10. Examples of clinical laboratory testing included the following:

    a. Allergy testing: Allergy referred to conditions in which immune responses to environmental antigens caused tissue inflammation and organ dysfunction. Allergy testing was performed to determine immunologic sensitivity or reaction to antigens for the purpose of identifying the cause of the allergic state.

    b. COVID-19 testing: COVID-19 testing assessed whether an individual had the novel coronavirus disease 2019, commonly referred to as "COVID-19."

11. Medicare did not cover diagnostic testing, including allergy and COVID-19 testing, that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Title 42, United States Code, Section 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." Title 42, Code of Federal Regulations, Section 411.15(a)(1).

12. If diagnostic testing were necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the

INFORMATION
4

beneficiary's specific medical problem" and "[t]ests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."

13. Medicare, through its contractors, set forth rules and regulations regarding the circumstances in which allergy testing was reasonable and necessary. One type of allergy testing was "in vivo," which correlated the performance and evaluation of selective cutaneous and mucous membrane tests (commonly referred to as "skin tests") with the patient's history, physical examination, and other observations. Another type of allergy testing was a test for allergy hypersensitivity "in vitro" (commonly referred to as "blood tests") by measurement of allergen-specific serum IgE. Percutaneous skin testing was the test of choice in most clinical situations where immediate hypersensitivity reactions are suspected. Overall, skin testing was quick, safe, and cost-effective.

14. Under certain limited conditions, in vitro testing was covered by Medicare Part B. Quantitative (measuring the amount of sensitivity) in vitro allergen specific IgE testing was covered under conditions where skin testing was not possible or is not reliable. Examples of indications for in vitro testing included patients with severe dermatographism, ichthyosis or generalized eczema. In vitro testing was significantly more expensive than skin testing.

15. Medicare's rules and regulations stated that not all patients should be tested for the same number of allergens. . The number of allergens that was tested or was required to be judicious and related to the history, physical findings, and clinical judgment specific to each individual.

### The Medi-Cal Program

16. Medi-Cal was a health care program, affecting commerce, that provided reimbursement for medically necessary health care services to indigent individuals in California. Funding for Medi-Cal was shared between the federal government and the State of California.

17. Medi-Cal was a "health care benefit program" as defined in Title 18, United States Code, Section 24(b).

INFORMATION

5

18. Individuals who qualified for Medi-Cal benefits were referred to as "beneficiaries." The California Department of Health Care Services ("DHCS") administered the Medi-Cal program. DHCS authorized provider participation, determined beneficiary eligibility, issued Medi-Cal benefits identification cards to beneficiaries, and promulgated regulations for the administration of the program.

19. Health care providers, including clinics, were able to receive direct reimbursement from Medi-Cal by applying to Medi-Cal and receiving a Medi-Cal provider number. Medi-Cal reimbursed health care providers for medically necessary treatment and services rendered to Medi-Cal beneficiaries.

20. To obtain payment for services, an enrolled provider, using its unique provider number, submitted claims to Medi-Cal certifying that the information on the claim form was truthful and accurate and that the services provided were reasonable and necessary to the health of the Medi-Cal beneficiary.

### The Defendant and Related Individuals and Entities

21. Defendant MADAN MOHAN was the Practice Administrator of a medical clinic ("Clinic 1") in the State of California. Clinic 1 was a participating provider with Medi-Cal.

22. Arrayit was a Nevada corporation based in the Northern District of California. Arrayit described itself as "a world leader in microarray technology empowering researchers and doctors in the life sciences, wellness and healthcare testing markets." Arrayit was a participating provider in the Medicare program and submitted claims to Medicare. Arrayit was not a participating provider with Medi-Cal.

23. Mark Schena was a 57-year-old scientist who described himself as the "Father of Microarray Technology," and served as the President of Arrayit.

24. CEO 1 was the Chief Executive Officer of Arrayit.

25. VP of Marketing 1 was the Vice President of Marketing of Arrayit.

INFORMATION

6

## The Health Care Fraud Conspiracy

26. From at least in or around 2019 to in or around April 2020, in the Northern District of California and elsewhere, the defendant,

**MADAN MOHAN,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with Mark Schena, CEO 1, VP of Marketing 1, and others known and unknown to the United States Attorney, to knowingly and willfully execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare and Medi-Cal, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

## Purpose of the Conspiracy

27. It was a purpose of the conspiracy for Defendant MADAN MOHAN and his co-conspirators to unlawfully enrich themselves by: (a) submitting or causing the submission of false and fraudulent claims to Medicare and Medi-Cal for services that were (i) procured by the payment of kickbacks and bribes; (ii) medically unnecessary; (iii) not eligible for Medicare or Medi-Cal reimbursement; and (iv) not provided as represented; (b) concealing the submission of false and fraudulent claims to Medicare and Medi-Cal, and the receipt and transfer of the proceeds from the fraud; and (c) diverting proceeds of the fraud for their personal use and benefit, and to further the conspiracy.

## Manner and Means

28. Defendant MADAN MOHAN and his co-conspirators used the following manner and means, among others, to accomplish the object and purpose of the conspiracy:

29. Defendant MADAN MOHAN solicited and received kickbacks and bribes from Mark

INFORMATION
7

Schena, CEO 1, VP of Marketing 1, and others in exchange for arranging for medical practitioners at Clinic 1 to collect blood samples and order allergy testing for patients to be conducted by Arrayit.

30. Defendant MADAN MOHAN, Mark Schena, CEO 1, VP of Marketing 1, and others would arrange for medical practitioners at Clinic 1 to order Arrayit to test for 120 allergens per patient regardless of the medical necessity, availability of the less expensive skin tests, reasonableness, rules against ordering the same test for each patient, or use of such testing in the treatment of each patient, in order to maximize the amount of claims for reimbursement that Arrayit billed to Medicare and Medi-Cal.

31. Defendant MADAN MOHAN, Mark Schena, CEO 1, VP of Marketing 1, and others would and did cause false and fraudulent claims for reimbursement of the aforementioned allergy tests to be submitted to Medi-Cal using the provider number and other identifying information for Clinic 1, as though the testing was reimbursable under Clinic 1's provider number with Medi-Cal, when in truth and in fact, it was not, because Arrayit performed the testing even though Arrayit was not a participating provider with Medi-Cal.

32. Defendant MADAN MOHAN, Mark Schena, CEO 1, VP of Marketing 1, and others entered into sham contracts and agreements, and created and maintained false and fraudulent invoices and other documents, in order to conceal and disguise the illegal kickbacks and bribes, as well as that the testing was not provided as billed to Medicare or Medi-Cal, including concealing the ordering physician, medical clinic, and/or laboratory that actually conducted the testing.

33. As the effects of the COVID-19 pandemic began to be felt in the United States and many patients faced difficulty obtaining access to COVID-19 testing, Mark Schena, CEO 1, VP of Marketing 1, and others used the pandemic as an opportunity to expand the pre-existing allergy test scheme and to capitalize on a national emergency for their own financial gain by offering COVID-19 testing and bundling the COVID-19 test with, i.e. requiring combination with, Arrayit's more expensive allergy

INFORMATION

testing, which did not identify or treat COVID-19.

34. In furtherance of the conspiracy, Defendant MADAN MOHAN, together with others, submitted or caused the submission of approximately $440,950.19 in false and fraudulent claims to Medicare and Medi-Cal that were procured through the payment of kickbacks and bribes, medically unnecessary, ineligible for reimbursement, and not provided as represented.

All in violation of Title 18, United States Code, Section 1349.

INFORMATION

[FORFEITURE ALLEGATION]

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

1. As a result of the violation of Title 18, United States Code, Section 1349, set forth in this Information, the defendant,

MADAN MOHAN,

shall forfeit to the United States of America any property, real or personal, that constitutes, or is derived, directly or indirectly, from the gross proceeds traceable to the commission of the offense, including, but not limited to, the sum of $71,058.53.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

    (c) has been placed beyond the jurisdiction of the Court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 982(a)(7).

DATED: November 20, 2020

DAVID L. ANDERSON
United States Attorney
Northern District of California

DANIEL KAHN
Acting Chief, Fraud Section
U.S. Department of Justice

_____/s/_____
JACOB FOSTER
JUSTIN WEITZ
Assistant Chiefs
Criminal Division, Fraud Section
U.S. Department of Justice

_____/s/_____
WILLIAM FRENTZEN
Chief, Corporate Fraud Strike Force
U.S. Attorney's Office for the
Northern District of California

INFORMATION	11

AO 257 (Rev. 6/78)

| **DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT** |

BY: ☐ COMPLAINT  ☒ INFORMATION  ☐ INDICTMENT
☐ SUPERSEDING

--- OFFENSE CHARGED ---

COUNT ONE: Conspiracy to Commit Health Care Fraud, 18 U.S.C. § 1349

☐ Petty
☐ Minor
☐ Misdemeanor
☒ Felony

PENALTY: COUNT ONE: not more than 10 years and $250,000 fine or two times the gain or loss, not more than 3 years supervised release, $100 special assessment.

Name of District Court, and/or Judge/Magistrate Location
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

FILED
NOV 20 2020
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

--- DEFENDANT - U.S ---
▶ MADAN MOHAN

DISTRICT COURT NUMBER
CR 20 00439 BLF VKD

--- PROCEEDING ---

Name of Complaintant Agency, or Person (& Title, if any)
USPIS, HHS-OIG, and FBI

☐ person is awaiting trial in another Federal or State Court, give name of court _____

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District _____

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY  ☐ DEFENSE
} SHOW DOCKET NO. _____

☐ this prosecution relates to a pending case involving this same defendant
} MAGISTRATE CASE NO. _____

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under _____

Name and Office of Person Furnishing Information on this form   David L. Anderson
☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)   W. Frentzen, J. Foster, J. Weitz

--- DEFENDANT ---

IS *NOT* IN CUSTODY
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ▶ _____

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District) _____

IS IN CUSTODY
4) ☐ On this charge

5) ☐ On another conviction  } ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution _____

Has detainer been filed?  ☐ Yes ☐ No  } If "Yes" give date filed _____

DATE OF ARREST ▶ Month/Day/Year _____
Or... if Arresting Agency & Warrant were not
DATE TRANSFERRED TO U.S. CUSTODY ▶ Month/Day/Year _____

☐ This report amends AO 257 previously submitted

--- ADDITIONAL INFORMATION OR COMMENTS ---

PROCESS:
☐ SUMMONS  ☒ NO PROCESS*  ☐ WARRANT   Bail Amount: _____

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance
Defendant Address: _____

* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time: _____   Before Judge: _____

Comments:

FILED

NOV 20 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

## CRIMINAL COVER SHEET

***Instructions:*** *Effective November 1, 2016, this Criminal Cover Sheet must be completed and submitted, along with the Defendant Information Form, for each new criminal case.*

| | |
|---|---|
| **CASE NAME:** USA v. MADAN MOHAN | **CASE NUMBER:** CR 20 00439 BLF VKD |
| Is This Case Under Seal? | Yes  No ✓ |
| Total Number of Defendants: | 1 ✓   2-7   8 or more |
| Does this case involve ONLY charges under 8 U.S.C. § 1325 and/or 1326? | Yes   No ✓ |
| Venue (Per Crim. L.R. 18-1): | SF   OAK   SJ ✓ |
| Is this a potential high-cost case? | Yes   No ✓ |
| Is any defendant charged with a death-penalty-eligible crime? | Yes   No ✓ |
| Is this a RICO Act gang case? | Yes   No ✓ |
| **Assigned AUSA (Lead Attorney):** William Frentzen, Jacob Foster, Justin Weitz | **Date Submitted:** 11/20/2020 |
| Comments: | |

Form CAND-CRIM-COVER (Rev. 11/16)

RESET FORM    SAVE PDF